UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERARDO REYES,<br><br>    Plaintiff,<br><br>v.<br><br>KARIM RASHEED, et al.,<br><br>    Defendants. | Case No. 17-cv-05563-WHO (PR)<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Dkt. No. 35 |

## INTRODUCTION

Plaintiff Gerardo Reyes alleges in this 42 U.S.C. § 1983 suit that medical staff at CTF-Soledad provided constitutionally inadequate medical care for his eyes, in violation of the Eighth Amendment.[1] He asserts that medical staff botched his cataract surgery and misaligned his right lens, resulting in continued eye pain and headaches. Defendants disagree that treatment was inadequate, deny that his lens is misaligned, and move for summary judgment.

The undisputed record shows defendants provided Reyes with constitutionally adequate medical care. Reyes's eye condition was investigated, diagnosed, and treated with surgery, new prescription lenses, over-the-counter pain medication, artificial tears, and repeated examinations that were conducted in response to plaintiff's requests. Nothing was found during these examinations that explained why Reyes was feeling pain, nor is there any admissible evidence that his lens is misaligned. The record does not show

---

[1] Reyes raises Eighth Amendment claims against Rasheed, Mulligan-Pfile, Mandich, and S. Posson, all medical staff. He also raises claims against grievance reviewers R. Branch, S. Denia, B. Grant, J. Lewis, K. Mindoro, J. Mislang, and S. Posson (again) for failing to intervene in response to his medical care grievances.

1 anything resembling deliberate indifference. Accordingly, defendants' motion for
2 summary judgment is granted.

**STANDARD OF REVIEW**

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue for which the opposing party by contrast will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c). The Court is concerned only with disputes over material facts and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323 (internal quotations omitted).

2

# DISCUSSION

## I. Medical Records and History

Reyes "agrees" with defendants' "historical analysis" of the facts, with a few exceptions. (Opp. to Mot. for Summ. J. (Opp.), Dkt. No. 40 at 2.)

Reyes suffers from long-term vision loss, diabetes, and glaucoma. (Mot. for Summ. J. (MSJ), Mulligan-Pfile Decl., Dkt. No. 35-1 ¶ 7.) In 2012, medical staff at CTF-Soledad concluded that the acuity in his left eye was restricted to light perception, which means that "correction is not possible." (*Id.* ¶ 8.) His right eye was at a "correctable" 20/25. (*Id.*) In 2013, Reyes spoke of pain in his right eye, loss of vision, and headaches. By August 2014, his right eye vision had decreased to 20/50 and he had developed glaucoma. (*Id.* ¶ 10.)

**July 2015**: Vision in Reyes's eyes had decreased to 20/400. He was referred to defendant K. Rasheed, an ophthalmologist, who recommended cataract-removal surgery. (*Id.* ¶¶ 11, 12.) The surgery was only for the treatment of his cataracts, not for his other eye conditions. (*Id.* ¶ 13.)

**September 2015**: On September 30, Rasheed performed outpatient surgery to remove Reyes's right-eye cataract. (*Id.*) When Reyes returned to prison after the surgery, he told a prison nurse that he was not in pain. (*Id.* ¶ 14.)

**October 2015**: On October 1, Rasheed examined Reyes and determined that his eye was doing well. He also prescribed eye drops for post-operative care. (*Id.*) On October 8, a nurse who examined Reyes noted that his eye was not irritated or painful. (*Id.* ¶ 15.)

On October 14, Rasheed surgically removed the left-eye cataract.[2] (*Id.* ¶ 16.) When Reyes returned from an October 15 examination, he stated "I'm doing alright [*sic*]."

---

[2] When Reyes returned to prison the afternoon after his left-eye cataract surgery, he complained of pain in his left eye. (MSJ, Mulligan-Pfile Decl., Dkt. No. 35-1 ¶ 16.) Rasheed traced the pain to a choroidal detachment, which he thought "should improve spontaneously," which it must have done because Reyes made no further complaints about the detachment or his left eye. (*Id.*)

(*Id.* ¶ 17.)

Later that month, on October 28, defendant Dr. Mulligan-Pfile, a primary care physician, first examined Reyes. Other than some mild (and expected) eye irritation caused by the eye drops prescribed by Rasheed for pain, Mulligan-Pfile saw nothing of concern. Reyes said nothing about eye pain. (*Id.* ¶ 18.)

**November 2015**: On November 2, Reyes was examined by Rasheed. His notes show nothing of concern, nor is there any notation that Reyes was experiencing pain. He recommended new glasses for Reyes, a request that was approved on November 5. (*Id.* ¶ 19.)

On November 9, Reyes complained of post-surgical pain in his right eye. He said that he told Rasheed about the pain, who said that such a sensation was normal during recovery. (*Id.* ¶ 20.)

On November 16, Reyes experienced serious pain in his right eye and was seen by Dr. M. Sweet, who thought that the pain was normal for after surgery, found no redness or discharge in or around the eye, and referred Reyes to Rasheed for a follow-up. (*Id.* ¶ 21.) Reyes's right eye was examined that same day by Dr. Tauchto, an optometrist, who found the right lens was in a normal position. (*Id.*) Reyes contends "that claim is not attributed to the on-sight [sic] optometrist, Dr. Tauchto." (Opp., Dkt. No. 40 at 2.)

Reyes contends that Dr. Sweet referred him to Dr. Tauchto, an oculist. He says that Sweet and Tauchto "discovered Reyes['s] eye pain was caused by the misalignment of his lens." (Am. Compl., Dkt. No. 13 at 5.) He says he has requested Tauchto's notes, but he has not received them. (Opp., Dkt. No. 40 at 2.) Handwriting on one of his medical records request forms states that the Tauchto notes were "[r]esearched" but were "not found in computer." (*Id.* at 7.) Reyes asks that the motion for summary judgment be stayed until he can receive all his medical records. (Dkt. No. 38.)

The only medical records from that date indicate that Reyes was seen by Dr. Sweet and that he was possibly referred to Dr. Tauchto, but nothing suggests that anyone found anything to account for his eye pain. (MSJ, Mulligan-Pfile Decl., Dkt. No. 35-1 at 52-54.)

4

Dr. Sweet's notes were produced; they say nothing about any observable problems with Reyes's eyes. (*Id.*) There are no notes from Tauchto in the record, nor any indication that he took notes. Even Reyes's handwritten commentary on his medical record request form shows that a search of medical files turned up nothing.

Reyes's assertion is the only evidence that Sweet and Tauchto came to the conclusion that the lens was misaligned and announced it to plaintiff. There is no other evidence, such as declarations from the doctors. Nor is there any other evidence, such as a declaration from an independent medical expert, to confirm the diagnosis.

On November 30, Mulligan-Pfile examined plaintiff again, who complained of pain in his right eye. (MSJ, Mulligan-Pfile Decl., Dkt. No. 35-1 ¶ 22.) He saw nothing notable about Reyes's right eye. He recommended that Reyes mention his pain to Rasheed, who had the expertise and equipment to examine the back of the eye. (*Id.*)

**December 2015**: On December 9, Reyes saw a nurse for eye pain. The nurse noted no indication of eye distress or abnormality, and prescribed naproxen for pain. (*Id.* ¶ 23.) Because there appeared to be nothing wrong, the nurse did not schedule an appointment for Reyes outside of his regular appointment schedule. (*Id.*)

On December 15, Mulligan-Pfile saw plaintiff regarding eye pain. She saw nothing that would explain it. (*Id.* ¶ 23.)

**January 2016**: On January 4, upon examination of plaintiff, Rasheed could not find any cause for Reyes's reports of eye pain. (*Id.* ¶ 25.) After that exam Rasheed concluded the pain was "not eye related," might be psychological rather than physical, and recommended that staff consider referring Reyes for a psychiatric examination if his complaints of eye pain continued. (*Id.*)

On January 7, an optometrist found that Reyes's uncorrected vision was 20/50 in the right eye and 20/400 in the left. (*Id.* ¶ 26.) He prescribed new lenses, and, according to Mulligan-Pfile, stated that transition lenses would be acceptable. (*Id.*) Defendant Dr. Posson disapproved the order for transition lenses because they were not medically necessary. (*Id.*)

5

Reyes alleges that Rasheed "authorized" transition lenses, which plaintiff needed "to protect himself from the x rays [*sic*]." (Am. Compl., Dkt. No. 13 at 7.) Defendants dispute that Rasheed authorized the lenses. The records state "transitions ok." (MSJ, Mulligan-Pfile Decl., Dkt. No. 35-1, Ex. A at 62.)

On January 14, Mulligan-Pfile examined Reyes during a routine visit. Reyes complained of right eye pain, but the physician saw nothing physical that would explain the pain. (*Id.*, Mulligan-Pfile Decl., Dkt. No. 35-1 ¶ 27.) Based on her and Rasheed's findings, Mulligan-Pfile concluded that there was no medical reason for further medical work on the eye. She provided Reyes with naproxen for his glaucoma and suggested that his new glasses might alleviate the pain. (*Id.*)

**February 2016**: On February 10, Reyes refused glasses because they lacked transition lenses. A nurse, defendant Mandich, told him that transition lenses had been denied because there was medical reason for them. (*Id.* ¶ 28.)

**April 2016**: On April 24, Reyes asked for medical care because of pain in his right eye. He also asked to see a specialist. Nurse Mandich examined plaintiff. According to her notes, she told Reyes that she could not refer him to a specialist and recommended that he accept his new glasses. Nothing in the notes indicates that there were any abnormalities nor any reason to refer him for further medical treatment. (*Id.* ¶ 29.)

**May 2016**: On May 13, Reyes was seen because of his complaints of right-eye pain. A nurse noted no abnormalities in Reyes's eyes. She did find that his visual acuity was declining and referred him to Mulligan-Pfile, who referred Reyes for a "further optometry work up." (*Id.* ¶ 30.)

On May 20, Reyes was seen because of his May 18 complaints of pain in his right eye and a persistent headache. The examining nurse found no abnormalities but found his visual acuity was better than it had been three days earlier. To defendants, such an improvement cuts against any assertion that Reyes's vision was worsening. (*Id.* ¶ 31.)

On May 25, Mulligan-Pfile examined Reyes owing to his multiple complaints about eye pain and appointments with nurses. She found "no objective evidence to support" his

claims of eye pain and noted his continued refusal of his prescription glasses. Mulligan-Pfile concluded that no further "work up" of Reyes's eye pain was warranted, based on her finding nothing of note in her exam. (*Id.* ¶ 32.)

**June 2016**: On June 16, Reyes saw Dr. G. Kalisher after Reyes "went man down" because of right-eye pain and headache. At the appointment, Reyes complained of right-eye pain and pressure and decreased sensation in the right side of his face. Kalisher noted no eye abnormalities, gave Reyes motrin for his pain, and referred him to ophthalmology. (*Id.* ¶ 33.)

Over the next ten days, Reyes was examined three times in response to his complaints of eye pain. The three nurses who nurses examined him saw no abnormalities or anything else of note. (*Id.* ¶ 34.)

On June 28, Rasheed examined Reyes. He noted that Reyes's lenses were properly aligned and could find nothing to explain his eye pain. He observed that Reyes's posterior capsules were cloudy, a condition called posterior capsule opacity (PCO), which often arises after cataract surgery. It does not cause pain, but it can affect visual acuity. Surgery was recommended — a yttrium aluminum garnet (YAG) capsulotomy. In his notes, Rasheed stated Reyes should use his corrective glasses, denied he needed transition lenses, and renewed his recommendation that Reyes have a psychiatric evaluation. After the appointment with Rasheed, Reyes again complained of right-eye pain. The examining nurse noted "no redness, no drainage." (*Id.* ¶ 35.)

**July 2016**: On July 1, Mulligan-Pfile examined Reyes for the final time. She agreed with Rasheed's recommendation and referred him for surgery to treat his PCO. (*Id.* ¶ 36.)

On July 13, Reyes was examined by a nurse because of his complaints of pain and headache. The nurse saw no abnormalities, gave him Tylenol for his pain, and told him about the "availability of free over the counter painkillers, including naproxen and ibuprofen," which were obtainable at the canteen. (*Id.* ¶ 37.)

At a July 26 exam, undertaken because of Reyes's complaints of right-eye pain, a

nurse noted no abnormalities and gave him Tylenol. (*Id.* ¶ 39.)

Because of his repeated complaints of eye pain and the lack of any sign of the cause, Mulligan-Pfile ordered x-rays of Reyes's skull. The results provided no explanation for the eye pain complaints or headaches. After the x-ray results arrived, Reyes was transferred off Mulligan-Pfile's medical caseload. (*Id.* ¶ 40.)

**July and August 2016**: Between July 29 and August 2, Rasheed performed YAG capsulotomies on Reyes's eyes. After the left-eye capsulotomy on August 2, Reyes complained of sharp pains in his right eye, neck, and behind his right ear. He was examined again because of his complaints of pain. He was given Tylenol and reminded about the available medications. (*Id.* ¶ 41.)

On August 10, Dr. Mindoro examined Reyes. According to Mulligan-Pfile, he found Reyes's eyes "appropriately responsive to light and free of observable abnormalities." He prescribed an anti-inflammatory drug, Sulindac, in response to Reyes's reports of pain. (*Id.* ¶ 42.)

On August 18, Reyes was examined in response to his August 16 complaints of pain and headache. The examining nurse saw no abnormalities, gave him Tylenol, and issued him a pass for him to attend school programs. (*Id.* ¶ 43.)

On August 20 and 24, he saw nurses for itchy eyes. Both nurses noted only mild "allergy related" irritation in the right eye. (*Id.* ¶ 44.)

On August 27, Reyes was seen because of his complaints of dizziness, diminished vision, and pain in his right eye, ear, and neck. The nurses gave him Tylenol, which he said relieved his symptoms. Reyes was examined by Dr. L. Hedden, who found no cause for Reyes's eye pain. She referred him for a psychiatric consult and stated in her notes her belief that Reyes might be "malingering for a secondary gain." (*Id.* ¶ 45.)

On August 31, Reyes was seen by a nurse because of his complaints of right-eye pain and headaches. The nurse saw no eye abnormalities. (*Id.* ¶ 46.)

**September 2016**: On September 8, an optometrist examined Reyes, measured his visual acuity, prepared new glasses, and advised Reyes to use eye drops to treat possible

8

dry eyes. (*Id.* ¶ 47.) On September 12, Dr. Mindoro examined Reyes, who complained of right eye pain. Mindoro saw nothing of note. (*Id.* ¶ 48.) "After that date, I find no CTF medical records in which Reyes complains of right-eye pain." (*Id.*) In the operative complaint, Reyes contends that he filed requests for medical treatment for his eye pain in November and December 2016, and in January and February 2017. (Am. Compl., Dkt. No. 13 at 12-13.)

An April 2017 MRI of Reyes's head, taken in response to his complaints of headaches, did not show any cause for the eye pain or headaches. (MSJ, Mulligan-Pfile Decl., Dkt. No. 35-1 ¶ 49.)

**August 2017**: Reyes was transferred to Correctional Institution for Men (CIM) in Chino, California. (MSJ, Dkt. No. 35 at 13.) While there, Reyes continued to complain about eye pain, headaches, and a misaligned lens. (*Id.*) Medical staff found nothing to explain the cause of such pain, despite repeated examinations of Reyes. (*Id.*) Like the staff at CTF-Soledad, CIM medical staff gave him over-the-counter medication and artificial tears as treatment. (*Id.*)

## II. Legal Analysis

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (equating the standard with that of criminal recklessness). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but "must also draw the inference." *Id.* Consequently, in order for deliberate indifference to be established, there must exist both a purposeful act or failure to act on the part of the defendant and harm resulting therefrom. *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992) (overruled on other grounds, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc)).

The Supreme Court has further clarified this standard by holding that "it is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). A mere accident or evaluative mistake is not to be characterized as wanton infliction of unnecessary pain. *Estelle*, 429 U.S. at 105. Instead, a plaintiff must show that his doctors or nurses embarked on a course of "medically unacceptable" treatment in "conscious disregard of an excessive risk to [his] health." *Toguchi v. Chung*, 391 F.3d 1051, 1058-60 (9th Cir. 2004). A claim of mere negligence related to medical problems, or a difference of opinion between a prisoner patient and a medical doctor, is not enough to make out a violation of the Eighth Amendment. *Id.*; *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981).

Reyes's medical history explains why his claim cannot succeed. Fundamentally, he alleges the lens of his right eye is misaligned because of the surgery. But the unrebutted medical evidence shows that his right eye is not misaligned, according to all optometrists and ophthalmologists who gave an opinion on the issue. (MSJ, Mulligan-Pfile Decl., Dkt. No. 35-1 at 53 and 111.)

Reyes asserts that on November 16, 2015, two doctors (Drs. Sweet and Tauchto) concluded that his eye pain was caused by a misalignment of the lens. (Am. Compl., Dkt. No. 13 at 5.) It is unclear whether he contends that the doctors told him this or if he believes their medical records contain this admission, or both. But as indicated above, Dr. Sweet's records contradicts what Reyes thinks they say, and Dr. Tauchto's cannot be found, if they ever existed. Reyes does not have a declaration or any other evidence to support his assertion that these persons came to such a conclusion.

Moreover, even if Drs. Sweet and Tauchto concluded what Reyes asserts, there is no evidence that such an opinion was medically reasonable. It is against the weight of the overwhelming medical record and evidence presented. As it stands, Reyes's unsupported assertion amounts to hearsay that is inadmissible at trial and may not be considered on summary judgment. *Orr v. Bank of America*, 285 F.3d 764, 773, 778 (9th Cir. 2002). But

10

if it could be credited, "[w]hen the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact." *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993). Reyes's assertions regarding Drs. Sweet's and Dr. Tauchto's opinions do not raise a material dispute.[3]

Reyes's eye condition was investigated, diagnosed, and treated with surgery, new prescription lenses, over-the-counter pain medication, artificial tears, and repeated examinations that were conducted in response to his requests. Nothing was found during these examinations that explained why he was feeling pain, nor is there any evidence that his lens was misaligned. He refused to wear his new glasses, despite repeated recommendations that he do so.[4] This undisputed record shows attention and care, not deliberate indifference. Reyes has not shown a genuine dispute of material fact that medical staff embarked on a course of "medically unacceptable" treatment in "conscious disregard of an excessive risk to [his] health," *Toguchi*, 391 F.3d at 1058-60, or otherwise failed to take reasonable steps to treat him, *Farmer*, 511 U.S. at 837.

In sum, there is no competent medical evidence that Reyes's lens is misaligned, let

---

[3] Two additional points are worth noting. First, there is undisputed evidence that Reyes had right-eye pain and headaches two years before his 2015 surgery, indicating that it was not the surgery or any subsequent treatment that caused such pain. In February 2013, Reyes complained in a health care services request form about "having serious headaches [,and] my right eye hurts as well." (MSJ, Mulligan-Pfile Decl., Dkt. No. 35-1 at 17.) Second, there is undisputed evidence that medical staff at CIM found nothing to explain Reyes's pain and headaches.

[4] Reyes claims that the denial of transition lenses constituted deliberate indifference. However, he has not shown a genuine dispute of material fact as to this claim. He has not provided any competent medical evidence that he required transition lenses for medical reasons or that he was harmed by the lack of them. His allegation that he needed such lenses to protect him from x-rays is not sufficient. (Am. Compl., Dkt. No. 13 at 7.) He does not detail, for example, how often he was exposed to x-rays. The record shows only one such instance, when Mulligan-Pfile ordered x-rays of Reyes's skull. (MSJ, Mulligan-Pfile Decl., Dkt. No. 35-1 ¶ 40.) (In one of Reyes's grievances, he states that he needs transition lenses because "while in the sun my eyes burn, hurt and tear up due to the sunlight." (Pl.'s Request for Judicial Notice, Dkt. No. 14 at 26.) These allegations of sunlight sensitivity do not appear in the operative complaint or in the opposition.)

alone that the cataract surgery misaligned the lens.  His assertion that Drs. Sweet and Tauchto concluded his eye pain was caused by a misalignment of the lens is not supported in the record.  Defendants, on the other hand, have presented competent medical evidence that the lens was not misaligned.

Because Reyes has not shown a genuine dispute of material fact regarding his claims against medical staff, he also has not shown a genuine dispute regarding his claims against the grievance reviewers.  The motion for summary judgment will be granted.[5]

## CONCLUSION

Defendants' motion for summary judgment is GRANTED in favor of all defendants.  (Dkt. No. 35.)  The Clerk shall terminate all pending motions, enter judgment in favor of all defendants, and close the file.

**IT IS SO ORDERED.**

**Dated:**  February 5, 2020



WILLIAM H. ORRICK
United States District Judge

---

[5] At this point, it is unnecessary to determine whether defendants are, as they assert, entitled to qualified immunity.